**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**EQUAL EMPLOYMENT**
**OPPORTUNITY COMMISSION,**

     Plaintiff,

   v.

**BRYAN C. DONOHUE M.D., P.C.** d/b/a
DONOHUE CARDIOLOGY
ASSOCIATES**,**
     Defendant.


**MONCEL DEITZ**,

     Plaintiff-Intervenor,

   v.

**BRYAN C. DONOHUE M.D., P.C.** d/b/a
DONOHUE CARDIOLOGY
ASSOCIATES, **BRYAN C. DONOHUE**,
**CHRISTOPHER C. ALLEN**, AND
**SANJAYA N. SAHETA**,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

2:09cv1280
Electronic Filing

## <ins>OPINION</ins>

  The Equal Employment Opportunity Commission ("EEOC" or "plaintiff") commenced

this action against Donohue Cardiology Associates ("DCA") pursuant to its authority under

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)-5(f)(1) & (3) ("Title VII"),

seeking redress for sexual harassment and retaliation on behalf of the charging party Moncel

Deitz ("Ms. Deitz") and other similarly situated individuals.  Ms. Deitz also brings claims

under the Pennsylvania Human Relations Act against DCA and the individual doctors.

Presently before the court are defendant's and Ms. Deitz's motions for summary judgment.  For

the reasons set forth below, the motions will be denied.

  Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted

if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's claim, and upon which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim.  National State Bank v. National Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986) (quoting Fed.R.Civ.P. 56 (a), (e)) (emphasis in Matsushita).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations."  Williams v. Borough

of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).  Nor can the opponent "merely rely upon

conclusory allegations in [its] pleadings or in memoranda and briefs."  Harter v. GAF Corp.,

967 F.2d 846 (3d Cir. 1992).  Likewise, mere conjecture or speculation by the party resisting

summary judgment will not provide a basis upon which to deny the motion.  Robertson v.

Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990).  If the non-moving party's

evidence merely is colorable or lacks sufficient probative force summary judgment must be

granted.  Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of North

America, 974 F.2d 1358, 1362 (3d Cir. 1992), cert. denied, 113 S.Ct. 1262 (1993) (although

the court is not permitted to weigh facts or competing inferences, it is no longer required to

"turn a blind eye" to the weight of the evidence).

 The record as read in the light most favorable to plaintiff establishes the background set

forth below.  DCA is a professional corporation specializing in interventional cardiology.

EEOC Brief in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 104) at 7.

Bryan C. Donohue ("Dr. Donohue") formed DCA in 1992 and DCA's primary office is located

in Washington, Pennsylvania, with satellite offices in Pittsburgh, McMurray, Monroeville, and

Frederick, PA.  Concise Statement of Material Facts (Doc. No. 100) at 4.  The alleged

harassers in this case, Dr. Donohue,  Sanjaya N. Saheta ("Dr. Saheta") and Christopher C.

Allen ("Dr. Allen"), herein collectively referred to as ("the doctors") are cardiologists and

partners in the practice.  Dr. Kirk Musselman and Dr. John Pensock also were partner-owners

of DCA during the relevant time period.[1]  Id. at 4.   All of the doctor-owners are cardiologists

who provide medical consultations and services at several hospitals, including UPMC-

---

[1] Dr. Musselman left the practice in April of 2008.  CSMF (Doc. No. 100) at 4.

Shadyside, Canonsburg and Washington Hospitals.  Id.

    At the time of Ms. Deitz's employment, DCA had an all-female staff, with the only

males in the office being the doctor-owners.  CSMF (Doc. No. 100) at 116.  Stacy Thomas

("Ms. Thomas"), Marcia Malesick ("Ms. Malesick"), and Patty Edwards ("Ms. Edwards")

formed DCA's management team, which was assembled in January of 2006.  Dr. Donohue's

wife, Maria Donohue, served as the practice's business manager.  Id. at 5.

    DCA's company policy provided that all complaints be directed to the management

team, which was responsible for the investigation and handling of inter-office grievances.  The

complaints then were reported to the doctors and any actions taken by the team had to be

cleared by either the doctors or Mrs. Donohue.  The doctor-owners had direct supervisory

authority over the management team as they were DCA employees as well.  Each doctor-owner

was vested with decision-making power with respect to the hiring and firing of DCA

employees, although unanimous agreement was required before such a decision was to be

made.  CSMF (Doc. No. 100) at 113.

    Plaintiff alleges that DCA maintained a workplace that subjected Ms. Deitz as well as

other similarly situated female employees to an intolerable and sexually hostile atmosphere

permeated with frequent and unwelcome sexual innuendo, language, and commentary.  CSMF

(Doc. No. 100) at 2.  The discriminatory conduct that forms the basis of plaintiff's sexual

harassment and retaliation claims rests upon the following recitation of facts.

<u>Charging Party Ms. Deitz</u>

    From July of 2000 to January of 2008, Ms. Deitz was employed by DCA as a part-time

Certified Physician's Assistant ("PA").  Concise Statement of Material Facts (Doc No. 100) at

6. This was Ms. Deitz's second period of employment with DCA, as she previously had been employed there between 1996 to 1997 while she still was married to a physician outside of the group.  Between 2005 and 2008, Ms. Deitz worked "almost exclusively" for DCA at UPMC-Shadyside Hospital.  CSMF (Doc. No. 100) at 114.[2]  Ms. Deitz did not work at the non-hospital based offices.  EEOC Brief in Opposition (Doc. No. 104) at 8.  Her primary responsibilities at UPMC-Shadyside included "daily rounding with the doctors as they examined patients, pulling charts, completing reports, [] answering patients' questions and providing the[] [doctors] with information." CSMF (Doc. No. 100) at 114.   Her duties required her to be in close proximity with the alleged harassers and to engage in significant verbal interaction with them.  Id.

Ms. Deitz derived her authority to practice as a PA from the alleged harassers and the other partners of the practice because her credentialing and hospital privileges were predicated upon their signatures and their "agreement to permit her to work under the auspices of their license." CSMF (Doc. No. 100) at 112.  The alleged harassers had direct supervisory authority over Ms. Deitz and conducted her performance evaluations.  Id.

Ms. Deitz alleges that defendant subjected her to a constant barrage of sexually inappropriate and harassing behavior during the course of her employment.  The alleged sexually hostile work environment occurred over a period of eight years, but "mushroomed" out of control in 2005, when Dr. Donohue assumed the position of Chief of Cardiology at UPMC-Shadyside.  CSMF (Doc. No. 100) at 26.  After 2005, Ms. Deitz was met with

---

[2] Beginning in 2006, she occasionally assisted complainant and Certified Registered Nurse Practitioner ("CRNP") Tammy Fendya ("Ms. Fendya") at the Canonsburg Hospital when Ms. Fendya's work load proved difficult to manage.  Id.  at 114.

"sexually harassing comments, innuendos, and gestures by Dr. Donohue, Dr. Allen, and Dr. Saheta" on a daily basis.  Id.  She also was treated for depression beginning in 2005.

### Ms. Deitz & Dr. Donohue

Of all the doctor-owners, Ms. Deitz worked most closely with Dr. Donohue.  Because he did not like seeing patients alone, he always sought Ms. Deitz out to assist him on rounds.  Dr. Donohue constantly told her to make sure she gave male patients "a good blow job" when she was done seeing them.  He often would follow up his blow job comment with a question about when she was "going to take care of [him]."   One time in front of a drug representative he said "I keep asking her when she's going to take care of me."  When Ms. Deitz would tell Dr. Donohue that she had visited a female patient, he repeatedly asked her if she had "let them lick [her] down below" or if she "licked them down below."  After visiting with male patients, Dr. Donohue frequently told them, in Ms. Deitz's presence, that he would send in a "Chinese", "Mexican," or "Black," girl to "take care" of the patient after visiting hours.

Dr. Donohue began changing into his scrubs in Ms. Deitz's presence when news of Ms. Deitz's divorce reached the office sometime in 2000.  On more than one occasion, Dr. Donohue dressed down to his underwear and simultaneously required Ms. Deitz to remain in the room so that she could continue relaying patient information to him.  He would undress all the way down to his "white briefs" while he gave her daily instructions or went over patient reports.  Ms. Deitz repeatedly expressed her disgust for this action.  She would stand up abruptly to indicate that she was going to leave the room, but was told by Dr. Donohue to not be "such a girl."   She was ordered to "sit down" and continue on with her recital of patient information while he continued to change.  Dr. Donohue similarly did not shy away from providing

intimate details of his marital sex life and would tell her how much he pleasured his wife.  He also would provide unsolicited commentary regarding his sexual conquests that occurred prior to his marriage and additionally discussed his "lesbian interests."

*Complaining and Reporting Behavior*

Ms. Deitz alleges that she "made all the partners of Donohue Cardiology fully aware of this ongoing inappropriate and sexually harassing behavior" and that she directly confronted the alleged harassers and "advised them in no uncertain terms that their sexual commentary was inappropriate, unprofessional, disgusting, and wrong."  Deitz Declaration (Doc. No. 71-22) at 6.

Ms. Deitz directly confronted Dr. Donohue about his conduct.  She repeatedly informed him that she was uncomfortable with and did not appreciate the language he used around her.  Often times she would walk away from him after he engaged in behavior, questions, or commentary that she considered to be sexually explicit and inappropriate for a professional workplace.  In response to her expressed concerns, Dr. Donohue repeatedly retorted back with comments designed to mock and downplay the nature and seriousness of Ms. Deitz's complaints.  He frequently laughed and said "don't be a baby" or "oh poor little you standing there all breathless."  Dr. Donohue also would tell Ms. Deitz, a practicing Christian, to "stop hanging on the cross," a phrase which she found to be "extremely offensive."  Ms. Deitz even called Dr. Donohue at home on his day off to relay how "uncomfortable" his ongoing behavior was making her, despite the fact that she normally "would never call any of the doctors on [their] day off."

Ms. Deitz also complained to Dr. Pensock and Dr. Musselman about Dr. Donohue's

7

sexually explicit actions and commentary.  Ms. Deitz states that she "often called Dr.

Musselman upset about the hostile work environment" and spoke with him "at least monthly"

about Dr. Donohue's behavior during the last 18 months of her employment.  There were

"many times" that Dr. Musselman related his personal concerns regarding the manner in which

the doctors and management "treated and spoke to their employees."  Dr. Musselman also

"frequently expressed that Dr. Donohue did not care about anyone except himself."  On "many

occasions" Dr. Musselman attempted to speak with Dr. Donohue on her behalf in order to

persuade him to stop the behavior, to no avail.  This was because "[i]t was a very well-known

fact among the staff that Dr. Musselman, despite being a full partner, carried no weight."  Deitz

Declaration (Doc. No. 71-22) at 9.

### Ms. Deitz & Dr. Saheta

Ms. Deitz worked with Dr. Saheta approximately 1-5 times a month and alleges that he

initiated and engaged in sexually inappropriate behavior, gestures and commentary "on every

occasion that [she] worked with [him]."  Deitz Declaration (71-22) at 7.  Dr. Saheta incessantly

spoke about his sexual conquests and gave intimate details of his sex life.  He provided vivid

commentary about his "30-minute blow jobs" and boasted about how many times he "came"

and how many condoms he used in a week/month.  Dr. Saheta kept a photo gallery of naked

women on his cell phone that he frequently showed to Ms. Deitz and other female subordinates

at the hospital "unsolicited."  During rounds, Dr. Saheta would place his phone in front of Ms.

Deitz's face and say "want to see the hot piece of ass that is after me?"  Ms. Deitz would

repeatedly decline to see the photo and put her "hand up in defense."  Dr. Saheta also told Ms.

Deitz that her "breasts were perky" and that her "ass is looking a bit large", which provoked

her to walk off from rounding with him.   On one occasion, Ms. Deitz witnessed Dr. Saheta

publicly announce to the nursing station staff at UPMC-Shadyside that he wanted "all the

nurses to take their tops off" because he wanted it to be a "topless nursing station."  Ms.

Deitz's colleague Kim Henderson, CRNP, also was present during this "announcement" and

was shocked and insulted by Dr. Saheta's behavior.  His sexually inappropriate language and

actions made Ms. Deitz so uncomfortable that she often made "excuses to round alone in other

areas of the hospital to limit my time with [him]."

     Dr. Saheta's behavior similarly was not well-taken by his patients.  On one occasion a

nuclear tech named Kristy Halligan lodged a formal complaint against him after an incident

with a male patient during the performance of a stress test.  Dr. Saheta was in the room with 3

female Canonsburg hospital employees and the patient who was on the treadmill.  In an

attempt to increase the patient's heart rate, he said the following:

> Picture Pamela Anderson on the beach with her hair flying. Now Carmen Electra
> comes on the beach, and they are touching each other.  Now Carmen is licking
> Pam.  Now they're kissing and lots of hair tossing is going on.

(Doc. No. 75-7) at 46.  Ms. Halligan twice said "Dr. Saheta!!!!" and was "very offended to

have to listen to this kind of talk while doing her job."  Id.  Approximately one year before Ms.

Deitz alleges she was fired, she told Dr. Musselman that she no longer wanted to work with Dr.

Saheta.  She told Dr. Donohue the same thing about four months prior to her termination after

Dr. Saheta made the comments about her breasts and buttocks.

*Complaining About and Reporting Saheta*

     Ms. Deitz complained directly to Dr. Saheta about his conduct, and also complained

several times to Drs. Donohue, Musselman, Allen and Pensock.  She often told Dr. Saheta that

he was "disgusting" and when Ms. Deitz told him that a patient refused to be seen by him because of his inappropriate behavior, Dr. Saheta responded with laughter.  Ms. Deitz's attempt to complain to Dr. Allen yielded the same result, as he too laughed at her objections to Dr. Saheta's actions.

Ms. Deitz complained to Dr. Donohue about Dr. Saheta's behavior "on 6 to 8 separate occasions" and informed him of Dr. Saheta's naked photo gallery and that he "was using inappropriate sexually charged language with me, the nurses, and on occasion with male patients."  Ms. Deitz told Dr. Donohue that Dr. Saheta's behavior was "disgusting" and that she did not want to work with him anymore.  Dr. Donohue either dismissed her by telling her he would handle it, or would tell her to "get off the cross" or to stop acting like such a "girl."

Ms. Deitz further asserts that Dr. Saheta retaliated against her for complaining about his behavior by giving her a poor employee evaluation for 2005-2006.  Ms. Deitz refused to accept the evaluation and asked the other doctor-owners to redo it so she would be eligible for a pay raise.  Dr. Allen did so and his evaluation stood in sharp contrast to the one given by Dr. Saheta.

Ms. Deitz complained to Dr. Donohue about Dr. Saheta's evaluation.  In response, Dr. Donohue asked her whether she had sex with Dr. Saheta and whether that could have something to do with his sexually harassing actions and conduct.[3]

Ms. Deitz complained to Dr. Musselman about Dr. Saheta on a number of occasions. He often informed her that he would speak with Dr. Donohue about Dr. Saheta's behavior.  In

---

[3] Ms. Deitz testified that she "never had a sexual encounter or relationship of any kind with Dr. Saheta."

reporting back to Ms. Deitz about any conversation regarding Dr. Saheta's conduct, he'd say "I talked to him and you know Bryan, I just don't think he hears things."

*Ms. Deitz & Dr. Allen*

Ms. Deitz worked with Dr. Allen for roughly 18 months, approximately 1-3 times per month.  Dr. Allen also engaged in sexually explicit commentary, innuendo, and inquiry on a daily basis, which Ms. Deitz alleges to be unwanted.  Dr. Allen frequently asked whether she had "gotten her aura adjusted" over the weekend and told her on several occasions that she needed to "loosen up and get laid."  Dr. Allen's statements increased in frequency during the last 6 to 9 months of Ms. Deitz's employment.  In the summer of 2007, Ms. Deitz had lost some weight, and Dr. Allen asked her whether her workouts consisted of "lots of sex."  Working with Dr. Allen proved stressful for Ms. Deitz, and she attempted to avoid contact with him both in person and on the telephone whenever possible.  She informed him "on more than one occasion" that she did not wish to engage in discussions regarding her personal life.  During the months immediately prior to her termination, she began to take a "defensive demeanor" in Dr. Allen's presence and became increasingly more quiet, crossed her arms, and limited their professional conversations.  When Ms. Deitz attempted to confront Dr. Allen to inform him that she found his behavior inappropriate and offensive, he merely laughed.

*Separation from Employment*

Ms. Deitz alleges that despite her repeated complaints to all the doctor-owners regarding the work atmosphere, the doctors persisted in their behavior which, if anything, progressively got worse.  In November of 2006, DCA converted her pay from hourly to salary and reduced her work schedule from 3.5 to 3 days per week.  This change resulted in a $12,000

per year pay reduction, and Ms. Deitz was instructed to either accept the lower salary or leave the practice.  Her request to remain at 3.5 days a week so that she could afford her household expenses was denied.  Linda Gordon, CRNP, Ms. Deitz's job share partner, was kept at an hourly rate despite the fact that they shared the same position.  The reason for this change allegedly was to cut down on overhead costs.

On January 11, 2008, Dr. Donohue fired Ms. Deitz after she told him that DCA was getting a bad reputation because of the doctors' behavior.   The conversation was brought up by Dr. Donohue at the end of the work day as Ms. Deitz was preparing to leave.  Dr. Donohue was scheduled to meet with Dr. Musselman the next morning to discuss whether he was going to leave the practice.  Dr. Donohue was "very edgy" and "agitated" and asked Ms. Deitz her opinion on why Dr. Musselman appeared to be upset and unhappy in the practice.  At first, Ms. Deitz told Dr. Donohue that she did not wish to get involved, but Dr. Donohue insisted she convey her personal thoughts as to the matter.  Ms. Deitz recounted the problems she had observed with the practice, and told Dr. Donohue that Dr. Musselman was not well respected by the other doctors at DCA, that he had just lost his long time nurse, and that he may have been troubled because the practice was losing a lot of employees "due to the actions of the doctors and management."  (Doc. No. 71-22) at 2.  Dr. Donohue asked her for specific examples, and Ms. Deitz again told him that she just wanted to go home.  Dr. Donohue then began "mocking" her in a high-pitched voice, saying  "Oh Bryan, Oh Bryan, you better be careful, everybody's going to quit."  Id.  He told her, "Come on, don't be a girl" and demanded that she provide examples for the alleged problems.  Ms. Deitz then told him about the problems with management, specifically how the office manager Patty Edwards was an issue,

12

and how it was a "waste of time to go to them."  Specifically, Ms. Deitz told Dr. Donohue

about how she was promised a big Christmas bonus to make up for her pay cut, and that she

received an amount that was substantially less than what was promised.  When Dr. Donohue

asked her whether she talked to Patty, Ms. Deitz told him that she hadn't because she had

"learned her lesson."  She said it was a waste of time to bring any issue to the management

team's attention.  She stated, "I am tired of being told by [DCA] that I didn't hear what I heard,

I didn't see what I saw, and I didn't read what I read" over and over again.  Dr. Donohue

responded by telling her "[i]n that case you are done here . . . [a]s of this moment you are no

longer employed with [DCA].  It has been a pleasure working with you. Now go!" (Doc. No,

71-22) at 3.

Ms. Deitz became extremely upset and immediately called Dr. Musselman to tell him

that she had been fired.  Dr. Musselman said "he can't do that" and told her he was frustrated

and shocked by the news and he would try to talk to Dr. Donohue next week after things

cooled down.  Dr. Musselman talked to Dr. Donohue to no avail, who told him that he had

fired Ms. Deitz and "this one is on me."  By Monday, January 17, 2008, the news that Ms.

Deitz had been fired reached UPMC-Shadyside.


Complainant Judy Devenney

Judy Devenney ("Ms. Devenney") was employed by DCA as a Registered Nurse from

December of 2005 until December of 2007 and worked primarily in DCA's Washington office.

She was Dr. Saheta's assigned office nurse, and her duties mainly consisted of prepping

patients and relaying any directions that were given by Dr. Saheta to the patients.  Her position

13

required her to work side-by-side with Dr. Saheta during office hours, which was about two days a week.

Ms. Devenney alleges she was subjected to "non-stop commentary of a sexual nature" every day that she worked with Dr. Saheta.  She stated that "[e]verything [Dr. Saheta] said alluded to sex" and that "it didn't matter what you were talking about, he would turn it around and twist it into a sexual reference."  For example, she alleges that Dr. Saheta asked her why she did not wear clothing that "show[s] a little more skin."  He often remarked on her apparel and told her that one particular set of scrubs reminded him of a "French maid's outfit."  Ms. Devenney was so disturbed by that comment that she stopped wearing that particular outfit. Dr. Saheta also told her that she should wear lace to work because he "liked lace."  Because Ms. Devenney's husband is a doctor, he said, "I bet you and your husband have a good time playing doctor and nurse," a remark which she found to be utterly repulsive.  Ms. Devenney asserts that she was subjected to a constant barrage of vulgar "one-liners" by Dr. Saheta that were unwanted and disgusting.  More than once, he walked out of an examination room and told her that a male patient "wanted her" or needed a little "pokey pokey."  Other times he would ask her whether she wanted to have sex with their patients.

Dr. Saheta spoke disrespectfully about female patients, staff, and other professionals. A large number of patients refused to be seen by Dr. Saheta and Ms. Devenney was the one who had to field such complaints and reassure the patients they were receiving quality medical care.  One time, he asked Ms. Devenney whether she thought a certain patient had fake breasts because they were "very perky."  He would comment on the bodies and legs of other professional women and say that was the type of person he wanted to marry.  Dr. Saheta would

14

also talk about famous actresses and movie stars in a sexual nature, commenting on their clothing and cleavage, and then tell Ms. Devenney that she was fat.  On more than one occasion Dr. Saheta made sexual gestures toward her as if he were masturbating.

Ms. Devenney also felt uncomfortable and disrespected as a woman when DCA allowed the doctors to keep a life-sized cardboard cut-out of a bikini-clad woman to remain in the doctor's office for several months, where it allegedly was within the full view of the all-female staff.  Dr. Saheta would even take his male patients over to the doctor's office to see it.  Ms. Devenney states that she could not avoid viewing the "beer girl" during the course of a normal work day and often turned it around so she would not have to look at it.

When the practice was looking to hire a new doctor, Ms. Devenney suggested they hire a female doctor and said "[t]hat's what we need around here."  Ms. Devenney believes that it was Dr. Allen who told her the practice would never hire a female doctor.  The last straw for Ms. Devenney was in November of 2007, when Dr. Saheta looked Ms. Devenney "up and down" in an examination room in front of a patient and told her that she "looked so good" that he could "put her on the table and do her right there."  Furious with the remark, Ms. Devenney glared at him in response and left the room to regain her composure.  She immediately called a potential employer and told them that she needed a job right then and that she did not care what kind of job it was.  When Dr. Saheta left the examination room, she returned to apologize to the patient for his sexually inappropriate commentary.  Later that day she confronted him and repeated her objections to being talked to in that manner.  A few hours later and despite her earlier protests to the sexual nature of his commentary, Dr. Saheta told her to "hike up her skirt" and go to a party with him.  Ms. Devenney submitted her letter of resignation within the

next month.

Ms. Devenney also witnessed Dr. Donohue and Dr. Allen make inappropriate sexual comments to female staff as well as patients, which often resulted in complaints from the patient or their family members as well as requests not to be seen by that doctor again.   She asserts that the reason why Dr. Donohue and Dr. Allen did not make such comments directly to her was because they worked with her husband who is a nurse at one of the hospitals they service.  She observed Dr. Donohue make his infamous "blow job" comment to one of the nurses who indicated her disapproval by yelling "Stop!" and making a face.  On another occasion in 2006, she observed him come out of a patient's room with Marcia Malesick and tell her to get in touch with a particular doctor, and then to "make sure you give [the patient] a good blow job and take care of him.  And I mean it better be a good one."  Ms. Malesick admitted that she found the language disrespectful and offensive but that it was just something that Dr. Donohue always said.

*Reporting and Complaining Behavior*

Ms. Devenney alleges she directly confronted Dr. Saheta about his appalling behavior, and regularly told him that he was "disgusting" and she wanted him to stop.  Dr. Saheta, however, did not take any of her complaints seriously and smiled, laughed, and showed no remorse at all.  He responded by mocking her and saying "[t]hat was inappropriate, wasn't it?" after he said something he knew made her upset or uncomfortable.  In December of 2006, after he made another inappropriate sexual remark, Ms. Devenney told him "in no uncertain terms" that she wanted him to stop making sexual comments and innuendo.  Dr. Saheta responded by giving her the finger.  She then asked him, "don't you have any respect for me as a woman or

as a nurse," to which he said nothing.  Ms. Devenney also complained to managers Stacy

Thomas and Marcia Malesick about Dr. Saheta's unrelenting conduct, and both were

unresponsive to her complaints.  Ms. Malesick merely replied, "It is what it is."

<u>Complainant Tammy Fendya</u>

Complainant Tammy Fendya ("Ms. Fendya") is a Certified Registered Nurse

Practitioner ("CRNP") who worked for DCA for five years, from February 27, 2003 until

November 23, 2007.  Mrs. Fendya worked primarily in the Washington and Canonsburg

hospitals beginning in early 2006 until her resignation in late 2007.  Her duties at the hospitals

required her to complete patient rounds with either Dr. Donohue, Dr. Saheta or Dr. Pensock,

examine patients, complete reports, answer patient questions, and provide the doctors with

information.  These responsibilities required her to work closely with the alleged harassers and

engage in substantial verbal exchange.

*Fendya & Dr. Donohue*

Like Ms. Deitz, Mrs. Fendya alleges that when Dr. Donohue became Chief of

Cardiology in 2005, "he took a superior attitude" and the work environment became filled with

non-stop sexually denigrating commentary and language.  Mrs. Fendya was told by Dr.

Donohue to give patients as well as other physicians a "lick down below" or a "blow job" so

often that it was a rare occasion when she "would encounter Dr. Donohue and he would not

say this."  Dr. Donohue made this comment while nudging her from the side.  Ms. Fendya has

witnessed and overheard Dr. Donohue direct his "blow job" comments to other female

professionals, including Ms. Malesick.  On one occasion in the summer of 2007, there was a

renal doctor from whom Dr. Donohue wanted patient referrals, and he instructed her to "give

him a blow job" so that DCA could secure the referrals.

Mrs. Fendya also was present when Dr. Donohue told male patients that he would send either a "Chinese, Mexican, or Black" girl to take care of them after visiting hours. Mrs. Fendya's father was one of DCA's patients, and Dr. Donohue told him that "he would be on the beach with two Mexican girls in no time." Mrs. Fendya heard "Dr. Saheta make the same or similar comments to many patients." Like Ms. Devenney, Mrs. Fendya also dealt with complaints from both patients and their wives about Dr. Donohue and Dr. Saheta's sexually charged language and commentary. Like Ms. Deitz, Dr. Donohue also undressed down to his underwear in front of her on two occasions. She was "shocked" and immediately picked up a newspaper to cover her face on the first occasion, and turned her back on him and said "we'll talk later" on the second.

In the summer of 2007, DCA was looking for either a new Nurse Practitioner or Physician's Assistant, and Mrs. Fendya along with Ms. Malesick and Ms. Thomas were assisting with the hiring process. The women were discussing how one of the male candidates was promising and should be interviewed, and the conversation was overheard by Dr. Allen who said, "[w]e're not going to interview a male. We don't want men." Affidavit of Tammy Fendya (Doc. No. 71-18) at 4. Dr. Saheta inserted himself into the conversation and also expressed that he did not want to hire a male for those positions. Mrs. Fendya maintains that she told the doctors that they could not discriminate, and the doctors reluctantly agreed to interview him, but stated "[w]e don't have to hire him." On a separate occasion Dr. Donohue told Mrs. Fendya that the doctors "didn't want to hire a female doctor because she would be too 'high maintenance,' and 'too fussy,' and they would have families and kids they would

18

have to take care of, so they couldn't devote time to the practice." Affidavit of Tammy Fendya (Doc. No. 71-18) at 4.

Mrs. Fendya complained to Dr. Donohue about his conduct only to have her complaints ignored or taken lightly. Eventually his harassing behavior became so "commonplace" that she would simply respond with a "whatever."

*Fendya and Dr. Saheta*

Mrs. Fendya alleges that "[t]here is not enough paper to write down all the [inappropriate things Dr. Saheta] did." He "regularly ma[de] inappropriate, offensive comments of a sexual nature to the nursing staff." After making such remark, he would always turn to Mrs. Fendya and say "I have you as my witness," to which she'd reply, "[y]es someday we'll be sitting in front a judge and I'll be saying, 'yep, he said that.'" Like Ms. Deitz, Dr. Saheta showed her his photo gallery of naked women on his cell phone and explained that the topless females were set as ring photos for some of his friends so that naked women would pop-up whenever he received a call. Like Ms. Deitz, Mrs. Fendya had no desire to see these pictures and told Dr. Saheta the same, to no avail. Dr. Saheta also showed her sexually explicit emails or text messages he received. On one occasion, a woman texted him and said "do you want to get laid tonight" and he responded by jumping up and down in excitement and told Mrs. Fendya that he had just received a "booty call." Mrs. Fendya also heard Dr. Saheta tell nurses at the hospital that they should wear more low-cut tops and she witnessed Dr. Saheta ask them to toss their hair like strippers and "porn videos." Dr. Saheta frequented the strip clubs and would report back the next day about the characteristics of the strippers' "tits and ass." He also bragged to Mrs. Fendya about how a group of pharmaceutical reps took him to a

strip club in the summer of 2007 and got him a lap dance.

Mrs. Fendya repeatedly confronted Dr. Saheta about his offensive sexual commentary and innuendo, and he would look at Mrs. Fendya, giggle and say "Oh I guess that was inappropriate," or "I shouldn't have said that." Mrs. Fendya would agree with him.

Mrs. Fendya alleges that "[o]n at least fifteen occasions, hospital staff and managers complained to her about Dr. Saheta's conduct" and she reported all these complaints to Drs. Donohue, Allen, and Pensock. Dr. Donohue's reactions to her complaints varied between "I'll take care of it" to "[d]on't hang yourself on a cross." She complained to Ms. Malesick several times about Dr. Saheta's cell phone pictures and sexually charged language, and to the other practice managers about the doctors' conduct in general. She was met with, "[i]t is what it is" or "[t]hat's how it is."

Approximately one year before Mrs. Fendya resigned, Dr. Donohue had received a complaint from a technical assistant in the stress lab that Dr. Saheta was using sexually inappropriate language with his patients. Specifically, Dr. Saheta was telling his patients to visualize famous sex symbols in order to increase their heart rate. Dr. Donohue requested that Mrs. Fendya investigate the complaint, and when she reported back to him, Dr. Donohue brushed her off and indicated that he was already aware of the situation. From Mrs. Fendya's perspective Dr. Donohue did not do anything to rectify the problem or ensure that it did not happen again.

Mrs. Fendya complained to and confided in Dr. Pensock, with whom she had a close working relationship. She related the complaints she had received from hospital staff and managers and she frequently discussed Dr. Donohue's "repeated use of offensive language and

[Dr.] Saheta's continuing sexual commentary to herself, patients and hospital staff." Though Dr. Pensock sympathized with her, he told her that his hands were tied and there was nothing he could do.

On May 7, 2008, Ms. Deitz filed a charge of discrimination with the EEOC against DCA as well as Dr. Donohue, Dr. Allen, and Dr. Saheta.  EEOC Charge (Doc. No. 123) at 2-4. In her charge, Ms. Deitz alleged that she was subjected to a sexually hostile work environment and was retaliated against for her opposition to the defendant's unlawful employment practices in violation of Title VII and the Pennsylvania Human Relations Act.  EEOC Charge (Doc. No. 123) at 2-4.

On July 30, 2009, the EEOC issued a determination letter stating that the evidence obtained from its investigation established a violation of Title VII.  EEOC Determination Letter (Doc. No. 101-1) at 2-3.  It concluded that "the abundance of sexually offensive remarks were sufficient to create a sexually offensive hostile work environment."  Id. at 3.  The EEOC filed a complaint against DCA on behalf of Ms. Deitz and similarly situated employees, alleging that DCA intentionally subjected its all-female staff to a sexually hostile work environment and retaliated against Ms. Deitz for her complaints regarding the discriminatory conduct by decreasing her pay and ultimately terminating her.  EEOC Complaint (Doc. No. 1) at 1.  Ms. Deitz filed a complaint in intervention adding state-law claims of aiding and abetting against Drs. Donohue, Allen and Saheta.  Plaintiff-Intervenor Complaint (Doc. No. 15) at 1.

Defendant contends it is entitled to summary judgment because the: (i) conduct in question was welcomed, (ii) conduct was not sufficiently severe or pervasive to create a sexually hostile work environment, (iii) complainants did not subjectively perceive the conduct

21

as sexually offensive, and (iv) <u>Faragher</u>/<u>Ellerth</u> defense precludes any liability on the part of

DCA.  Plaintiff contends that it has created genuine issues of material fact as to whether the: (i)

behavior was unwelcome, (ii) conduct of the doctors was sufficiently severe or pervasive, (iii)

complainants subjectively perceived such behavior as sexually hostile or abusive, and (iv)

<u>Faragher</u>/<u>Ellerth</u> defense is available to the doctors.

Title VII of the Civil Rights Act of 1964 prohibits discrimination "against any

individual with respect to [his or her] compensation, terms, conditions, or privileges of

employment, because of such individual's ... sex."  42 U.S.C. § 2000 e-2(a)(1).  The prohibition

"not only covers 'terms' and 'conditions' in the narrow contractual sense, but 'evinces a

congressional intent to strike at the entire spectrum of disparate treatment of [protected

employees] in employment."  <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 78

(1998) (quoting <u>Meritor Savs. Bank, FSB v. Vinson</u>, 477 U.S. 57, 64 (1986)).  "Title VII is

violated 'when the workplace is permeated with discriminatory [gender-based] intimidation,

ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment.'"  <u>Ocheltree v. Scollon Productions,

Inc.</u>, 335 F.3d 325, 331 (4th Cir. 2003) (quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21

(1993)).  Title VII is designed to protect against "working environments [that are] so heavily

polluted with discrimination as to destroy completely the emotional and psychological stability

of minority group workers."  <u>Meritor</u>, 477 U.S. at 66 (quoting <u>Rodgers v. EEOC</u>, 454 F.2d 234,

238 (5th Cir. 1971)).

A plaintiff alleging a sexually hostile work environment must establish the following

elements: (1) the employee suffered intentional discrimination because of a protected trait; (2)

the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 276-77 (3d Cir. 2001). Proffering sufficient evidence to meet each element of a hostile work environment claim generally precludes summary judgment in the defendant's favor and permits the plaintiff to proceed to trial. Id. at 280-281.

In general, the Supreme Court's cases in the area have taken "a middle path between making actionable conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." Harris, 510 U.S. at 21. Striking such a balance is necessary to maintain the distinction between objectively hostile or abusive work environments that violate Title VII's broad rule of workplace equality and simple teasing, offhand comments and isolated incidents that are beyond its reach. Harris, 510 U.S. at 21; Clark County v. Breeden, 532 U.S. 268, 271 (2001). The Court has emphasized that the standards for judging hostility must remain sufficiently demanding so that Title VII does not become "a general civility code." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).

The workplace conduct underlying a harassment claim is not to be measured in isolation. Instead, it is to be assessed "by looking at all the circumstances." Clark County, 532 U.S. at 270.

Specifically in dispute is whether plaintiff has set forth evidence sufficient to satisfy the

second, third and fifth elements of its prima facie case.[4]  In other words, at issue is whether the record contains sufficient evidence to support findings that the actions and behavior of the doctors (i) rose to the level of severity or pervasiveness needed to constitute actionable harassment, (ii) subjectively were perceived by complainants[5] as being sexually hostile or abusive and unwelcome, and (iii) preclude defendant from invoking the Faragher/Ellerth defense.

The record and applicable law demonstrate that plaintiff has adduced more than sufficient evidence to create genuine issues of material fact with respect to whether the conduct of the doctors subjected their all-female staff to a sexually hostile work environment.  They also demonstrate that defendant is not entitled to summary judgment based on the Faragher/Ellerth defense.

*Sexually Hostile Work Environment Claim*

Plaintiff has proffered sufficient evidence to support a finding that the sexual commentary and innuendo, vulgar and inappropriate conduct, and demeaning and stifling responses to complaints that the doctors exhibited toward their female staff rose to the level of severity or pervasiveness needed to create a hostile work environment.  The Supreme Court has

---

[4]  The first and fourth elements are undisputed by the parties and the facts adduced easily will support a finding that the complainants were intentionally discriminated against because of their sex and that a reasonable person in their position would have found the conduct in question to be sexually hostile or abusive.  Furthermore, "[t]he intent to discriminate based on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit, and thus should be recognized as a matter of course."  Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 n. 3 (3d Cir. 1990).

[5]  The term "complainants" refers to Ms. Deitz, Ms. Devenney, and Ms. Fendya collectively.

reiterated that "sexual harassment is actionable under Title VII only if it is so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." Clark County, 532 U.S. at 270; Meritor, 477 U.S. at 67.   Conduct which amounts to the "ordinary tribulations of the workplace" is beyond the purview of Title VII. Faragher, 524 U.S. at 788.  Conduct becomes actionable only where it has become sufficiently "extreme to amount to a change in the terms and conditions of employment." Faragher, 524 U.S. at 788.

In this regard, "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" will not be sufficient to advance a hostile work environment claim. Faragher, 524 U.S. at 788 (internal quotations and citations omitted).  Such conduct does not rise to the level of a change in the terms and conditions of employment.  Id.

In contrast, the "pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of hostile environment, as may posting of pornographic pictures in common areas and in plaintiffs' personal work spaces." Andrews, 895 F.2d at 1485.  Indeed, "[o]bscene language and pornography quite possibly could be regarded as 'highly offensive to a woman who seeks to deal with her fellow employees and clients with professional dignity and without the barrier of sexual differentiation and abuse.'"  Id. at 1485-86 (quoting Bennett v. Corroon & Black Corp., 845 F.2d 104, 106 (5th Cir. 1988)).

All of the circumstances surrounding the asserted hostile conduct are to be examined in determining whether a work environment is sufficiently severe or pervasive.  See Harris, 510 U.S. at 23.  The court should assess the objective severity of the harassment and can consider

(1) its frequency, (2) its severity, (3) whether it is physically threatening or humiliating (as opposed to an offensive utterance), (4) whether it unreasonably interferes with the employee's work performance and (5) the effect on the employee's psychological well-being.  Id.  It is the totality of the circumstances that is critical and no single factor is required or dispositive.  Id. As the Court has opined:

> [t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts ... to distinguish between simple teasing or roughhousing ... and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

Oncale, 523 U.S. at 81-82; accord Abramson, 260 F.3d at 279-80 (pervasive requirement is satisfied where the evidence on the environment as a whole "can be found to aggregate to create an environment hostile to a person [sharing the plaintiff's protected trait].") (citing in support Durham Life Ins. Co., 166 F.3d 155).

    The atmosphere at DCA was permeated with offensive sexual innuendo and vulgar commentary and its owners felt empowered to engage in any topic of conversation, regardless of how sexually intimate or offensive it may have been to their female listeners.  The complainants were met with an ongoing barrage of sexually explicit commentary, innuendo and conduct on a "near daily basis."   Ms. Devenney had to "mentally prepare" herself to go to work, and was even told by Dr. Saheta to wear clothes that showed "a little more skin" as well as more lace because he had a sexual preference for women in lace.  She was insulted in front of a patient when Dr. Saheta looked her up and down and told her that she looked so good that he could lay her down on the table and do her right there.  Ms. Deitz was asked in front of a

drug representative about when she was going to "take care" of Dr. Donohue, after he made one of his infamous "blow job/lick down below" comments. The female staff were told to make sure they gave patients a good blow job or lick down below on nearly every instance a patient was being prepped in the room. Ms. Deitz regularly fielded complaints from patients regarding these kinds of statements as well as comments about sending in Black, Mexican or Chinese women to take care of the patient. It went so far that such a complaint was made by her father-in-law, who was a DCA patient.

Dr. Donohue also stripped down to his underwear in front of Ms. Deitz as well as Mrs. Fendya on numerous occasions, and told them to "stop hanging on the cross" and acting like "girls" and "babies" when they objected.

The record also reveals another incident involving Dr. Donohue making a vulgar comment to Marci Snee, DCA's secretary, in front of a potential male partner. Dr. Donohue and Dr. Saheta were in the middle of interviewing a male physician when Ms. Snee walked in the room. Dr. Donohue looked at Ms. Snee and stated "why don't you tell him some of the benefits of working at Donohue Cardiology." She started discussing benefits and bonuses and Dr. Donohue told her that that wasn't the kind of benefits he was talking about. He told Ms. Snee to tell the male candidate about the specific benefits that she gives personally, implying sexual favors. The male interviewee looked at Marci and said "oh I'm married," to which Dr. Donohue replied  "oh[,] well these are benefits you wouldn't tell your wife about." Deposition Testimony of Marci Snee (Doc. No. 71-15) at 16. Embarassed, Ms. Snee told the male candidate that she did not know what Dr. Donohue was talking about. She later demanded an apology from him for making her look bad in front of someone who potentially could have

been her employer.

Dr. Allen frequently inquired as to whether his female employees had gotten laid or told them that they needed to "get their aura adjusted" or "get laid." He asked Ms. Deitz, who had lost some weight, whether her workouts consisted of "lots of sex." He would intrude into the physical space of his female employees and approach them from behind and rub their shoulders. In addition, he told his female employees that the practice would never hire a female physician, and conversely, they did not want to hire a male nurse practitioner/physician's assistant. According to Mrs. Fendya, he stated that "[w]e're not going to interview a male. We don't want men." These statements and others supported the inference that they did not want a female physician because she would not be able to devote the same amount of time to the practice as she presumably would be tied down with children. Dr. Donohue also shared Dr. Allen's sentiment and stated that they would not hire a female doctor because of the concern that she would be too "high maintenance" and "too fussy." These statements similarly raise an inference that the reason they did not want to hire a male nurse or assistant was because they enjoyed being the males in control and the atmosphere created by having all female subordinates.

Dr. Saheta publicized his naked photo gallery on his cellphone and boasted about his sexual conquests and how many condoms he used in a week. Dr. Saheta told Ms. Deitz that her "ass is getting bigger and [her] breasts are looking perkier." After a weekend adventure at the strip club, he would come to work and provide vivid detail about the characteristics of the strippers' "ass and tits." He stuck pictures of topless females in the faces of his female employees and asked the female staff and nurses at the hospital to take their tops off and toss

28

their hair like strippers.  Ms. Fendya was forced to field complaints from both patients and their wives about Dr. Saheta's comments.

In addition to patient complaints, Dr. Saheta also was the target of several complaints from hospital nurses.  The record reflects that the female nurses at UPMC Shadyside lodged so many complaints against Dr. Saheta regarding his sexually inappropriate behavior that Dr. Donohue had to reassign him in order to reduce the amount of time he spent there in an effort to avoid future complaints.  Dr. Donohue told Ms. Deitz that he needed to take Dr. Saheta out of UPMC Shadyside as a means of damage control.  The record also reveals that DCA had lost a significant number of employees during the last few years prior to Ms. Deitz' termination.

This sexually charged behavior and environment was tolerated by the management team as well as Dr. Musselman and Dr. Pensock and perpetuated by the very individuals charged with the affirmative duty of preventing and correcting workplace discrimination.  Thus, the sufficiently-supported allegations recounted above do not paint the picture of a setting that is merely tinged with "sporadic incidents" of  the kind of generally crude behavior that falls outside of Title VII's purview.  Compare Benny v. Pennyslvania, Dept. of Corrections, State Correctional Inst. at Somerset, 211 Fed. Appx. 96, 97 (3d Cir. 2006) (Sporadic incidents during which employee encountered inappropriate sexual remarks from co-workers did not create an objectively hostile work environment.).  The language and commentary was highly personalized and specifically targeted at the female complainants.  See Fairbrook v. Medical Clinic, P.A., 609 F.3d at 329 ("When assessing the severity of [the defendant's] conduct, a jury could give significant weight to the intensely personal nature of [the sexual remarks].").  The frequency in which the inappropriate behavior occurred coupled

29

with the fact that a lot of the remarks "seemed intended to ridicule [the complainants] in the eyes of patients and drug representatives" suffices to support a finding that the conduct of the doctors created a sexually hostile or abusive work environment.  E.E.O.C v. Fairbrook Medical Clinic, P.A., 609 F.3d 320, 329 (4th Cir. 2010).

In addition, consistent remarks such as "stop acting like a girl," stop playing the martyr and females are "too fussy" and "high maintenance" reflect a view from top management that a female emotionally is inferior to a male and males occupy a superior role in the management of medical business.  They were designed to ridicule and humiliate the complainant and make them feel that they were emotionally inferior for perceiving the conduct as hostile and offensive.  When these types of remarks are coupled with a constant barrage of comments that treat females as sex objects and consistently are advanced at every opportunity where the recipients seek to raise objection or complaint, such conduct surely can be found to be gender-based ridicule that offensively was misogynistic, demeaning,  belittling and oppressive.  They all served to permeate the entire environment with hostility and abuse.

Against this backdrop, defendant's assertion that the language used merely was offensive utterances is unpersuasive.  Equally unavailing is its contention that the social context in which these incidents occurred somehow mitigates or excuses the doctors' conduct.

It is true that the appropriate inquiry "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target."  Oncale, 523 U.S. at 81.  Contrary to defendant's suggestion, however, a reasonable juror could easily conclude that viewing the incidents in the context in which they occurred serves only to aggravate the severity and impact of the remarks as they were made by physicians who were also the owners

of a prominent cardiology practice and who are thus expected to adhere to a high degree of professionalism by virtue of their positions.  See Fairbrook, 609 F.3d at 329 (The inappropriate sexual remarks by the physician-employer "could be found by a jury to heighten tensions, to adversely affect the performance of female professionals, and to communicate a dismissive attitude to female [employees] that hardly seems consonant with the highest standards of professional treatment.").

Furthermore, the disparity of power between the alleged harassers and their all-female staff can be viewed by the trier of fact as increasing the severity of the conduct because the doctors had direct supervisory authority over the complainants as well as the ability to shape and control their professional paths.  See id. (The "disparity of power between the harasser and the victim" is a factor to be taken account and "a jury could likewise conclude that [the] severity of [the doctor-harasser]'s conduct was exacerbated by the fact that he was not only [the victim's] immediate supervisor but also the sole owner of [the medical clinic].").  Indeed, the record reflects that Ms. Deitz and Mrs. Fendya had difficulty finding employment elsewhere because the prospective employers were hesitant to "steal" them from DCA due to the power and prestige Dr. Donohue possessed as Chief of Cardiology at UPMC Shadyside. Ms. Deitz and Mrs. Fendya's practice privileges were contingent upon sponsorship by the doctor-defendants and their agreement to permit the two to work under the auspices of their licenses.

In analyzing whether a plaintiff has established a prima facie case, the court cannot confine its analysis to "the individual pieces of evidence alone," but must "view the record as a whole picture."  Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 276 (3d

31

Cir. 2001) (citing Woodson v. Scott Paper Co., 109 F.3d 913, 921 (3d Cir. 1997)).  This is because "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but the overall scenario."  Id. (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990)).

Here, the cumulative effect of all the incidents is more than adequate to support a finding that the allegedly harassing behavior was sufficiently severe or pervasive.  Given this overall scenario, the granting of summary judgment based on the evidence underlying this element would be improper.

Plaintiff also has adduced sufficient evidence to create triable issues of fact with regard to whether the complainants subjectively perceived the conduct as sexually hostile or abusive. The gravamen of any sexual harassment claim is that the conduct complained of was "unwelcome."  Meritor, 477 U.S. at 68; see also 29 C.F.R. § 1604.11(a) (1981) (only unwelcome sexual advances generate Title VII liability).  To constitute actionable harassment, "the conduct must be unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive."  Clegg v. Falcon Plastics, Inc., 174 Fed. Appx. 18, 25 (3d Cir. 2006) (quoting Bales v. Wal-Mart Stores, Inc., 143 F.3d 1103, 1108 (8th Cir. 1998)).

As recited above, each of the complainants voiced their objections to the doctors' vulgar commentary and conduct directly to the offending doctors.  Ms. Devenney testified that she had to "mentally prepare herself" to go to work each morning.  She stated that "[b]y the end of the day working with [Dr. Saheta], my usually positive attitude was destroyed; he wore

me down until I could not take it anymore."  After his comment about doing her on the table,

which was made in front of a female patient, she was so irate that she had to leave the room

and go into another room to compose herself.  Instead of Dr. Saheta apologizing to the patient,

Ms. Devenney went back to the room after he left and apologized to the patient for having to

witness the offensive interaction.  Later, after another sexually explicit comment by Dr. Saheta,

Ms. Devenney pleaded with him to stop making those kind of comments, to which he

responded by giving her the finger.  She directly asked him, "don't you have any respect for

me as a woman or as a nurse?" and received no response.

Ms. Deitz walked off from rounding with Dr. Saheta after he commented about her "ass

getting bigger" and her "breasts looking perkier."  She told him he was disgusting and left him

to round alone.  He simply laughed in response.

Ms. Deitz and Mrs. Fendya would also try to shield themselves from seeing Dr.

Saheta's cell phone picture gallery of topless women by placing their hands in front of their

faces.  He stuck his phone in their faces regardless of their protests.

Despite Ms. Deitz' repeated requests to stop asking about her sex life and whether she

"got any" over the weekend, Dr. Allen persisted in his inquiries. She testified that she "became

very quiet" and she began to take "a very defensive demeanor in his presence" where she

would "cross [her] arms and keep [her] professional conversations to a minimum."

The complainants repeatedly told the doctors they were "disgusting" and "pigs."  They

voiced objection to the doctors on an ongoing basis and asked for respect and decorum in the

workplace.  The requests were met with responses that either dismissed the complaint through

additional  sexually charged commentary or innuendo or denigrated the complainant by

suggesting that her reaction as a female was inferior.

Defendant's contention that the comments merely were crude jokes and were not literal is unpersuasive and irrelevant to an analysis of whether the complainants subjectively perceived their work environment as sexually hostile or abusive.  Williams v. General Motors Corp., 187 F.3d 553, 566 (6th Cir. 1999) (what is necessary is that "the victim must subjectively perceive the environment to be abusive" and thus "the intent of the alleged harasser is irrelevant in the court's subjective prong analysis.") (quoting Harris, 510 U.S. at 21).  The argument that complainants understood the comments to be a joke also is of no avail. Id.  ("The fact that [the victim] thought that [the harasser] meant his comments to be a joke does not necessarily mean that [the victim] perceived them as a joke.").  Succinctly stated, "humor is not a defense under the subjective test if the conduct was unwelcome."  Id.

Defendant further cites to the notes taken by Ms. Deitz's therapist and argues that because there is no mention of work-related problems, this somehow indicates that she was not subjectively offended by the environment at DCA.  In the light most favorable to plaintiff, however, the record will support a finding that the only thing more bothersome to Ms. Deitz than the environment at work was her recent venture back into the "singles" world after her divorce.  The evidence indicates she was overwhelmed by the transition and wanted to learn how to cope with being a single parent raising children while simultaneously holding down a job.  She also sought advice on how to incorporate her Christian values into her dating life.

Furthermore, to assert that she did not discuss work-related problems simply because they were not memorialized by the therapist on paper is an unfounded extrapolation. Defendant does not rely on Ms. Deitz's testimony to establish this point.  She testified that the

stressful environment at work contributed to her decision to seek counseling and it must be

assumed that she will shed light on the degree to which her workplace environment impacted

her emotional health and desire for therapy.  In any event, the only reasonable inferences to be

drawn in the non-moving party's favor are either that she did discuss her problems at work and

the therapist did not transcribe her comments on paper, or that Ms. Deitz did not talk about

work because other problems in her personal life were more pressing.[6]

      In light of the above, defendant's contention that such conduct was welcomed loses its

force.  Defendant argues that the complainants were active and willing participants in the

sexual banter and often times initiated topics that were sexually charged.  It provides the

following examples to support this assertion:

1) Mr. O' Brien heard Ms. Deitz regularly tell Dr. Donohue jokingly that she  "needed to be taken care of" and that she and Mr. O'Brien we [sic] going to go to a hotel down the street;

2) Ms. Deitz, who had been exercising for months, and was dressed to go out for the night with Dr. Saheta and others, asked Dr. Saheta, who also was trying to lose weight, whether her boobs looked perky and whether her butt looked big;

3) Ms. Deitz would ask Dr. Saheta if he got "laid";

4) Ms. Deitz told Dr. Donohue, Dr. Saheta and Dr. Allen that she had the most amazing sex while on a trip to Mexico with Mr. Pantoni, her boyfriend;

5) Mr. Pantoni, with whom Dr. Saheta had become friendly, also told Dr. Saheta in the presence of Ms. Deitz that Ms. Deitz "rode [him] like a maniac" on that trip, at which Ms. Deitz snickered and smiled;

6) Ms. Fendya thought that Dr. Saheta needed a girlfriend and would try to find him someone to date and also made comments to him about women at the strip club where

---

[6] Of course, having to cope with the challenges implicit in the later inference merely highlights the importance of keeping the workplace free from the destructive conduct banned by the public policy reflected in Title VII.

her son worked;

7) Ms. Deitz told Dr. Allen about sexual things that she was doing at home with her sexual partners;

8) Ms. Deitz relayed to Dr. Allen details of her sexual relationship with a catheter rep she was dating;

9) Ms. Deitz told Dr. Allen about her sexual encounters and non-sexual relationships with other doctors, including Dr. Silverman and Dr. George; and

10) Ms. Deitz told Dr. Allen about a trip she took to a resort with another physician and how much fun she had doing different sexual things with him.

Def. Brief in Support of Summary Judgment (Doc. No. 85) at 14.

This being a quintessential case of "he said-she said," and considering the fact that the above incidents are extensively disputed, any undertaking to ascertain the true nature of the incidents would be improper as our function is not that of a fact-finder. Thus, the issue of whether the doctors' behavior was welcomed by the complainants is ripe for argument to a jury, as the inquiry regarding the issue of subjective perception of the doctors' behavior as being sexually offensive or hostile is a question of fact. Based on the evidence of record, a reasonable juror could reject as factually untrue each and every proposition advanced by defendant and conclude that the complainants subjectively perceived the environment at DCA as an unwelcomed sexually hostile and/or abusive environment. Consequently, the request for summary judgment on this basis must be denied as well.

Plaintiff also has set forth evidence which, if believed, would preclude defendant from asserting the Faragher/Ellerth defense. In general, although Title VII is a remedial statute, its primary objective is to avoid harm. Faragher, 524 U.S. at 806. Consequently, the law and regulations under Title VII recognize an employer's affirmative obligation to prevent

violations.  Id.  They also afford protection to employers that make reasonable efforts to

discharge that duty.  Id.  Similarly, employees have a coordinate duty to use all reasonable

means available to avoid or minimize any injury or damages flowing from Title VII violations.

Id.

     The standards governing employer liability for a hostile work environment differ

depending on the source of the hostility.  Clark v. United Parcel Services, Inc., 400 F.3d 341,

348 (6th Cir. 2005).  Imputing liability for co-worker harassment is grounded in the employer's

direct negligence.  Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 333-34 (4th Cir. 2003).

Where a co-worker is the source of the hostile environment, "liability exists where the

defendant knew or should of known of the harassment and failed to take prompt remedial

action."  Kunin v. Sears Roebuck and Co., 175 F.3d 289, 293 (3d Cir. 1999) (quoting Andrews,

895 F.2d 1486); Jackson v. Quanex, 191 F.3d 647, 659 (6th Cir. 1999) (same); Galdamez v.

Potter, 415 F.3d 1015, 1024 (9th Cir. 2005) ("Once the Postal Service actually knew (or

reasonably should have known) about what Galdamez was experiencing, it was required to

'undertake remedial measures reasonably calculated to end the harassment.'") (quoting

McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1113 (9th Cir. 2004)).

     In contrast, "[a]n employer is subject to vicarious liability to a victimized employee for

an actionable hostile environment created by a supervisor with immediate (or successively

higher) authority over the employee."  Faragher, 524 U.S. at 807.  This liability is predicated on

the theory that the "tortious conduct is made possible or facilitated by the existence of the actual

agency relationship."  Durham Life, 166 F.3d at 150.  Liability for the actions of a supervisor is

divided into a number of different categories.  Where no tangible employment action is taken,

the employer may raise an affirmative defense predicated on the exercise of reasonable care to prevent harm.  No defense is available, however, where the supervisor's harassment culminates in "tangible employment action."[7]  Id. (quoting Faragher, 524 U.S. at 808).  It likewise is unavailable where "the harassing supervisor is . . . 'indisputably within that class of an employer organization's officials who may be treated as the organization's proxy.'"  Johnson v. West, 218 F.3d 725, 730 (2000) (quoting Faragher, 524 U.S. at 789).

Where the reasonable care defense is available the employer may defend by establishing two elements: (1) it exercised reasonable care to prevent and correct promptly any harassing conduct; and (2) the employee unreasonably failed to utilize the preventive or corrective opportunities made available or to avoid harm otherwise.  Faragher, 524 U.S. at 807; Hurley, 174 F.3d at 118.  The existence of an anti-harassment policy with adequate complaint procedures suitable to the employment circumstances appropriately is considered under the first element.  And whether the employee unreasonably failed to utilize a suitable policy or take advantage of some other reasonable means to avoid harm is considered under the second.  Faragher, 524 U.S. at 806-7; Clark, 400 F.3d at 348-49.  The defense thus has both "active and inactive components: before the employer can benefit from the defense, it must prove both that it *acted* reasonably in

_____

7 A tangible employment action is one that "constitutes a significant change in employment status, such a hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  It likewise may be established by demonstrating a materially adverse change based upon other indices that are unique to the particular situation.  Id. (citing with approval Crady v. Liberty National Bank & Trust Co. of Indiana, 993 F.2d 132, 136 (7th Cir. 1993)).  In contrast, a demotion without change in pay, benefits, duties or prestige or even a re-assignment to a less convenient job or location is insufficient.  Id.  (citing with approval Kocsis v. Multi-Care Management Inc., 97 F.3d 876, 887 (6th Cir. 1996) and Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994)).

38

preventing and correcting harassment and that the victimized employee unreasonably *failed to act* by not utilizing complaint opportunities." Clark, 400 F.3d at 349 (emphasis in original). The defense is lost if the evidence is insufficient to support either prong. Id.; Faragher, 524 U.S. at 808; Hurley, 174 F.3d at 118; Savino v. C.P. Hall Co., 199 F.3d 925, 932 (7th Cir. 1999) ("Thus, to merit an instruction on the Faragher/Ellerth affirmative defense the employer must show that: (1) the plaintiff endured no tangible employment action; (2) there is some evidence that the employer reasonably attempted to correct and prevent [the] harassment; and (3) there is some evidence that the employee unreasonably failed to utilize the avenues presented to prevent or correct the harassment.").

Defendant's efforts to insulate itself from liability as a matter of law through the reasonable care defense are unavailing. First, where the alleged harasser is sufficiently high ranking in the company so as to be considered an "alter-ego" of the employer, liability is automatic and the Faragher/Ellerth defense is unavailable. Strauser v. Jay Fulkroad & Sons, Inc., 2005 WL 2020636 at *8 (M.D. Pa. July 28, 2005) ("Under the alter-ego theory certain high ranking officials' conduct can be held automatically imputable to the employer" and the alter ego theory "would prevent [the] defendant from relying on the Ellerth/Faragher affirmative defense."); accord Ellerth, 524 U.S. at 758 (a master can be vicariously liable for sexual harassment where the master intended the conduct or the consequences) (citing Restatement (Second) of Agency § 219(2)(a)); Durham Life, 166 F.3d at 152 n.8 (same); Johnson, 218 F.3d at 725 (same); cf. Faragher, 524 U.S. at 789 ("Nor was it exceptional that standards for binding the employer were not in issue in [Harris v. Forklift Systems, Inc., 510 U.S. 17 . . . (1993) ]. In that case of discrimination by hostile environment, the individual

39

charged with creating the abusive atmosphere was the president of the corporate employer, 510 U.S., at 19, . . . who was indisputably within that class of an employer organization's officials who may be treated as the organization's proxy.") (citing <u>Burns v. McGregor Electronic Industries, Inc.</u>, 955 F.2d 559, 564 (8th Cir.1992) (employer-company liable where harassment was perpetrated by its owner); <u>Torres v. Pisano</u>, 116 F.3d 625, 634-635, and n. 11 (2d Cir.) (noting that a supervisor may hold a sufficiently high position "in the management hierarchy of the company for his actions to be imputed automatically to the employer"), <u>cert.</u> <u>denied</u>, 522 U.S. 997 (1997);  and <u>Katz v. Dole</u>, 709 F.2d 251, 255 (4th Cir. 1983) ("Except in situations where a proprietor, partner or corporate officer participates personally in the harassing behavior," an employee must "demonstrat[e] the propriety of holding the employer liable")).

Here, the alleged harassers were the owners of DCA and as such they easily satisfy the test for liability under the alter-ego theory.  <u>See</u> <u>Strauser</u>, 2005 WL 2020636 at *8 ("<u>Faragher</u> suggests that the following officials may be treated as an employer's proxy: a president, owner, proprietor, partner, corporate officer, or supervisor hold[ing] a sufficiently high position in the management hierarchy of the company for his actions to be imputed automatically to the employer.") (quoting <u>Johnson</u>, 218 F.3d at 730 (internal quotations and citations omitted)).  Thus, the doctor-owners' position at the very pinnacle of DNA's management hierarchy forecloses reliance on the reasonable care defense.

Second, even assuming that the doctor-owners were not the alter-ego of DCA, the defense is unavailing because defendant has failed to advance sufficient evidence to support a finding that it took reasonable care to eradicate the harassment from the workplace.  The record as read in the light most favorable to plaintiff is replete with evidence to support findings that

each complainant directly confronted the doctors and asked them to stop with their sexual commentary and vulgar conduct; and the complaints repeatedly fell on deaf ears, as the doctors' behavior persisted and even escalated despite those objections.

Defendant's contention that the complainants did not "complain or oppose the alleged harassment in any meaningful manner" misses the mark.  Def. Brief in Support of Summary Judgment (Doc. No. 85) at 3.  It argues that because plaintiffs did not memorialize their complaints in written format, this somehow detracts from the quality and veracity of the complaint.  Defendant further argues that the complainants did not meaningfully report the alleged harassment because of their "failure to bring complaints to the management team [and] failure to follow up on claimed complaints to the physicians."[8]

Defendant's argument implies that verbal complaints lack the necessary quality and veracity needed to constitute legitimate objections.  Such form over substance has never been countenanced.  To the contrary, it has long been settled that actual or constructive notice of ongoing harassment is all that Title VII requires.  See, e.g., Knabe v. Boury Corp., 114 F.3d 407, 411 (3d Cir. 1997) ("We have explained that an employer is liable for an employee's behavior under a negligence theory of agency 'if a plaintiff proves that management-level employees had actual or constructive knowledge about the existence of a sexually hostile work environment and failed to take prompt and adequate remedial action.'") (quoting Andrews, 895 F.2d at 1486).  To establish constructive notice, the plaintiff can either prove (1) management-level employees were provided with enough information to "raise a probability of sexual

---

[8] Complainants dispute this contention and assert that they did complain to management but that management was "useless" and took no steps to investigate or correct the behavior.

harassment in the mind of a reasonable employer," or (2) "the harassment is so pervasive and open that a reasonable employer would have had to be aware of it."  Kunin v. Sears Roebuck and Co., 175 F.3d 289, 294 (3d Cir. 1999).  A defendant also may have constructive notice where the circumstances are such that a reasonable person in the employer's management team would recognize that the environment was permeated with hostility.  Harsco Corp. v. Renner, 475 F.3d 1179, 1188 (10th Cir. 2007) ("the pervasiveness of sexual harassment can properly lead to an inference of knowledge.").

Defendant's position on the lack of meaningful notice is divorced from a fair reading of the record in the light most favorable to the non-moving party.  Complainants repeatedly made their objections known to the harassing doctor-owners.  They also placed the office managers on notice of their objections to the environment.  For example, both Ms. Deitz and Mrs. Fendya made Ms. Malesick and other office managers aware that they considered conduct such as the sexually charged commentary and innuendo in front of patients and the repeated display of Dr. Saheta' cell phone photo gallery to be offensive, unprofessional and denigrating and they wanted it to stop.  Against this backdrop defendant's position begs the question of what could be a more "meaningful" way to oppose allegedly unlawful behavior than directly confronting the harassers and giving notice to the individuals holding all levels of management authority.

Moreover, given the backdrop set forth above, defendant has failed to advance sufficient evidence to support a finding that the anti-harassment policy in place was capable of eradicating the discriminatory conduct permeating the workplace.  In theory, DCA had a sexual harassment policy that set forth a procedure directing that complaints be made to the management team.  In practice, however, a reasonable juror could not find the policy was

effective and reasonable because the management team was unable to reprimand or otherwise correct the harassing behavior, as the members of the team were DCA employees as well. With the harassers being the doctor-owners and the management team being controlled by and answerable only to them, this case stands in sharp contrast to situations involving harassment by a fellow co-worker, where complaining to management would in all reasonable likelihood produce an effective result because of the hierarchy of the personnel. In other words, the evidence taken in the light most favorable to plaintiff will more than sufficiently support a finding that any anti-harassment policy actually in effect at DCA was ineffective in eradicating the harassing conduct as the members of the management team relied on the alleged harassers for their paychecks and were powerless to control their actions. See Strauser, 2005 WL 2020636 * 7 (Genuine issue of material fact as to effectiveness of anti-harassment policy existed where the alleged harasser was the president of the company, "had the final say on the check writing and whatever took place" and would have ultimate control over any EEO redress for his own conduct).

Defendant also claims that the failure to follow up on complaints made directly to the alleged harassers is a bar to liability. Def. Brief in Support at 3. In other words, it argues that complaining directly to the physicians about behavior the complainants found to be repulsive and offensive is not a legally reasonable expression of opposition.

Defendant unsuccessfully attempts to read a new requirement into Title VII. Complainants are not under any legally recognized duty to "follow up" after repeated complaints to the very individuals who are both the harassers and the ones charged with the affirmative statutory duty to correct and prevent such discrimination in the workplace

43

promptly.  Notice of the offensive conduct was sufficient to trigger their duty to take effective measures aimed at eradication.  See Bouton v. BMW of N. America, Inc., 29 F.3d 103, 110 (3d Cir.1994) (prompt and effective action by the employer will relieve it of liability); Weston v. Pennsylvania, 251 F.3d 420, 426-27 (3d Cir. 2001) ("Our rule 'envisions prompt remedial action when the hostile environment is discovered.'") (quoting Bouton, 29 F.3d at 110).  On the instant record, defendant and the doctor-owners are not at liberty to decide unilaterally that the complainants did not voice their objections loud enough or long enough.  In other words, given the repeated complaints made to the harassers themselves and the fact that they were owners of DCA, a reasonable juror could conclude that the complaints were well-grounded, provided reasonable notice of unwelcomed conduct, and the doctors-owners failed to correct or eliminate the offensive conduct.  Of course, if these findings were to be made the Faragher/Ellerth defense also would be inapplicable for this alternative reason. [9]

*Retaliation*

Plaintiff has advanced sufficient evidence to proceed with Ms. Deitz' claim of retaliation. In order to establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate that (1) he or she engaged in protected activity; (2) the employer took adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse employment action.  Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006); Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997); Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 177 (3d Cir. 1997); Charlton v. Paramus

---

[9] If proven to be part of the hostile work environment, the cut in pay and termination alleged to have been suffered by Ms. Deitz are forms of tangible employment action that also would preclude the application of the reasonable care defense as to her.

Bd. Of Educ., 25 F.3d 194, 201 (3d Cir. 1994). A claim for retaliation under Title VII is evaluated pursuant to the McDonnell Douglas and Burdine burden shifting analysis. Moore, 461 F.3d 331, 342 (3d Cir. 2006) ("If the employee establishes this prima facie case of retaliation, the familiar McDonnell Douglas approach applies.").

"Opposition to discrimination can take the form of informal protests of discriminatory employment practices, including making complaints to management." Moore, 461 F.3d at 343 (quoting Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir.2006)) (internal quotations omitted). A court "look[s] to the message being conveyed rather than the means of conveyance" to determine if a plaintiff sufficiently "opposed" the discriminatory conduct. Id. at 343.

The scope of Title VII's anti-retaliatory provision is broader than its anti-discrimination provision. Burlington Northern and Santa Fe Ry. v. White, 548 U.S. 53, 64 (2006). It protects an employee from "retaliation that produces an injury or harm." Thus, its protections extend to all forms of retaliatory action that are "materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. at 2415 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006) and Washington v. Illinois Dept. of Revenue, 420 F.3d 658, 662 (7th Cir. 2005)).

Although its protections are broad, the anti-retaliatory provision does not protect an employee from all forms of retaliation. Requiring a plaintiff to show "material adversity" serves the important purpose of separating "significant from trivial harms." Id. at 2415. Such an approach is necessary because the Court has repeatedly emphasized that Title VII "does not set forth 'a general civility code for the American workplace.'" Id. (quoting Oncale, 523 U.S. at 80;

45

and citing <u>Faragher</u>, 524 U.S. at 788 (judicial standards for sexual harassment must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing' ")).  In other words, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."  <u>Id.</u> (citing 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed.1996) (noting that "courts have held that personality conflicts at work that generate antipathy" and "'snubbing' by supervisors and co-workers" are not actionable under § 704(a)); <u>see</u> <u>also</u> <u>Jensen</u>, 435 F.3d at 451 ("[Title VII] does not mandate a happy workplace.").

The above standards for judging harm are to be administered from an objective point of view.  <u>Burlington Northern</u>, 548 U.S. at 68.  The court is not to delve into the subjective feelings of the employee.  <u>Id.</u>

In utilizing the objective standard close attention is to be paid to context.  "Context matters."  <u>Id.</u> at 69.  It is important to recognize that "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."  <u>Id.</u> (quoting <u>Oncale</u>, 523 U.S. at 81-82).

The record also must contain sufficient evidence from which the finder of fact can link the materially adverse action to retaliatory animus.  <u>Moore</u>, 461 F.3d at 346.  Two central factors are brought into play: (1) the "temporal proximity" between the protected activity and the alleged retaliation and (2) the existence of any "'pattern of antagonism in the intervening period.'"  <u>Id.</u>

(quoting Abramson, 260 F.3d at 288) (quoting Woodson, 109 F.3d at 920-21). "Timing alone raises the requisite inference when it is "unusually suggestive of retaliatory motive." Id. "But even if 'temporal proximity ... is missing, [it is appropriate to]  look to the intervening period for other evidence of retaliatory animus."  Id. (quoting Krouse v. American Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir.1997)).  However, "[t]hese are not the exclusive ways to show causation" and it is important to consider all of the proffered evidence as a whole to determine whether it "may suffice to raise the inference." Id. (quoting Farrell, 206 F.3d at 280 and citing in support Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 178 (3d Cir.1997) ("The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific.")).

Finally, if the plaintiff proffers sufficient evidence to establish a prima facie case, the burden shifts to the defendant to advance a legitimate explanation for any treatment brought into question.  If the employer meets that burden, the plaintiff must come forward with sufficient evidence to "overcome the non-retaliatory explanation" and permit a finding of retaliatory discrimination. Id.

The evidence of record will support a finding that Ms. Deitz sufficiently opposed the doctors' sexually explicit commentary and behavior.   Ms. Deitz alleges that the sexually charged atmosphere "mushroomed" out of control in 2005 and she repeatedly voiced her objections to the discriminatory conduct directly to the alleged harassers and complained about their behavior to the other two doctors in DCA.  The record will support a finding that she told the doctors on many occasions that she did not like, appreciate or want to be subjected to their sexually explicit language and conduct and she found it to be intrusive and inappropriate.  Notwithstanding

defendant's contention that she never "formally" filed any complaints or made any "significant" complaints to management, there is ample evidence to support a finding that the "message being conveyed" was that she found the conduct to be offensive and that she wanted it to stop.  The evidence in the light most favorable to plaintiff could lead a reasonable juror to conclude that she reasonably opposed the discriminatory behavior and repeatedly gave sufficient notice of her objections.  Thus, she engaged in protected activity under Title VII.

Plaintiff also has proffered sufficient evidence on the question of whether adverse action was taken against Ms. Deitz in response to her opposition.  In November of 2006, shortly after the toxicity of the environment and the corresponding complaints began to mushroom, DCA converted Ms. Deitz's pay from hourly to salary and reduced her work schedule from 3.5 to 3 days per week.  Ms. Deitz's job share partner, Linda Gordon, CRNP, was kept at an hourly rate and was not converted to a salaried employee despite the fact that they shared the same position. Ms. Deitz complained to Dr. Musselman about the change in pay and schedule and he told her that he thought it was retributive.  In 2006, Ms. Deitz also received a poor performance evaluation from Dr. Saheta despite the fact that the other physicians had given her exemplary evaluations.  In order to receive a raise, she had to ask another doctor to redo Dr. Saheta's evaluation, which he did.

Ms. Deitz was also terminated from DCA.  The termination occurred abruptly and directly after she raised the lack of response to the repeated complaints she had made about being exposed to an offensive environment.

The above actions are precisely the type of material adversity that would dissuade a reasonable employee from opposing prohibited conduct.  Thus, the record will support a finding

that materially adverse retaliatory action was taken against Ms. Deitz.

The record also will support a finding that the material adversity was causally linked to the protected activity.  It will also support a finding that defendant's explanation for the materially adverse retaliatory action is a pretext for retaliatory animus.

Defendant contends that the reason for Ms. Deitz's change in schedule and payment structure was prompted by concerns of escalating overtime costs.  The record contains a document which memorializes this concern and states that the reason why Linda Gordon was not reclassified as a salaried worker was because "her overtime is minimal and she works only 2 days per week" and that "[c]hanging her salary does not make sense since her hours may vary depending on need and availability to cover vacation time."  (Doc. No. 75-7) at 42.

While this document lends support to defendant's purported reasoning, the evidence taken in the light most favorable to plaintiff is sufficient for a reasonable juror to conclude that her change in pay and schedule was in retaliation for her repeated complaints about the discriminatory conduct.  The action was taken shortly after Ms. Deitz became more vocal about the environment and repeatedly voiced her objection to behavior by the doctors that she found offensive.  The same materially adverse employment action was not taken against a similarly situated job-sharing employee, notwithstanding the fact that the same rationale advanced for the treatment of Ms. Deitz would have been applicable.  The timing and disparate treatment of similarly situated individuals provide more than a sufficient basis to support a causal link.

Moreover, the evidence is such that a reasonable juror could conclude that Ms. Deitz was terminated as a result of her ongoing opposition to the doctors' behavior.  Ms. Deitz alleges that on Friday, January 11, 2008, she was preparing to leave for the day and found herself in a

conversation with Dr. Donohue regarding whether Dr. Musselman would be leaving the practice.

Dr. Donohue asked her opinion about why Dr. Musselman was not happy at DCA, and she told

Dr. Donohue that she did not want to get involved and just wanted to go home.  Dr. Donohue

demanded that she give him her opinion, and so she stated that "there have been a lot of

problems in the group, that Dr. Musselman does not get a lot of respect from the other doctors . .

. and [] the practice ha[s] lost a lot of employees due to the actions of the doctors and

management."  Declaration of Moncel Deitz (Doc. No. 71-22) at 2.  Dr. Donohue asked her to

provide a specific example, and she said "[p]lease Bryan, just let me go home, I don't want to get

involved."  Id.

At that point, Dr. Donohue started to mock her and said "[y]ou stand here all breathless

telling me" (and in a high-pitched voice) "[o]h Bryan, [o]h Bryan, you better be careful,

everybody's going to quit."  Id.  Ms. Deitz tried to explain that the management team, and Patty

Edwards in particular, were part of the problem.  When asked to provide another example, she

again pleaded with him to just let her go home.  He then said "[c]ome on, don't be a girl" and

asked her to give an example of what she meant.  She told him that she did not receive the big

Christmas bonus that she was promised since her pay had been cut and it was actually the

smallest bonus she had received in years.  Id. at 3.  When Dr. Donohue asked if she confronted

management about it, she said "[n]o I've learned my lesson.  It's a waste of time to go to them-to

have any discussion on any level with the management team."  Id.  She then said, "I am tired of

being told by [DCA] that I didn't hear what I heard, I didn't see what I saw, and I didn't read

what I read" over and over again.  Id.  In response, Dr. Donohue said "[i]n that case you are done

here."  She said "Bryan", and he cut her off and said "[a]s of this moment you are no longer

employed with Donohue Cardiology.  It has been a pleasure working with you.  Now go!"  Id.
He then pointed his finger down the hallway towards the office and turned around and walked
away.

Ms. Deitz became extremely upset, went directly to the locker room, and called Dr.
Musselman to tell him that Dr. Donohue had fired her.  According to Dr. Musselman, Ms. Deitz
was upset when she called to tell him she had just been fired.  When he asked Dr. Donohue about
it on the following Tuesday, Dr. Donohue told him that he had fired Ms. Deitz and "it was on
him."  Testimony of Dr. Musselman (Doc. No. 102) at 5.

In contrast, defendant seeks to establish a very different account.  It claims that on Friday,
January 11, 2008, Dr. Donohue and Ms. Deitz were engaged in conversation and Ms. Deitz was
complaining about her financial compensation.  She had been unrelenting in her complaints
regarding her reclassification as a "salaried" employee and on that afternoon she began
complaining to Dr. Donohue again about money and how unresponsive Patty Edwards was to her
financial concerns.  Testimony of Dr. Donohue (Doc. No. 71-6) at 35.  He proceeded to say
"Moncel, it may be that this is not the right practice for you" and maybe she needed to look
somewhere else for a job.  Id.  Ms. Deitz responded that perhaps he was right and she was the
one who stormed off.  After the conversation ended, it was unclear to Dr. Donohue whether Ms.
Deitz had "quit."  He also was unsure of whether she would be returning to work the next week.
What was clear to him was that he had not fired her that day.  Id.

The evidence in the light most favorable to plaintiff will support a finding that Ms. Deitz
was fired for her opposition to the doctors' conduct, which by implication raised her repeated
complaints about the hostile environment.  First, Ms. Deitz is divorced with two children.  As a

single parent she asserts she would not have abruptly ended her employment without giving proper notice and having a new job already secured, an argument that has considerable appeal and can easily be credited by the finder of fact.

Second, defendant's own business records demonstrate that her separation from employment was not voluntary.  The COBRA Election form that DCA was required to complete after Ms. Deitz was no longer employed specifies that the "event" that prompted the continuing coverage was "Termination."  Deitz COBRA Election Form (Doc. No. 75-7) at 35.  The form contained three separate options: Termination, Reduction in Hours, and Employee elected termination.  On Ms. Deitz's COBRA form the "Termination" box was checked, as opposed to the employee elected termination box which would have been consistent with defendant's explanation that she quit.  In contrast, Ms. Devenney, who admittedly resigned from DCA, had the "Employee elected termination" box checked on her COBRA Election form.   Devenney COBRA Election form (Doc. No. 75-7) at 41.  In addition, the record contains a letter by Ms. Deitz dated January 21, 2008, addressed to DCA which states " I was verbally terminated on January 1[1], 2008 at 4:30 p.m. by Dr. Donohue."  Doc. No. 75-7 at 37.

Third, defendant announced Ms. Deitz was not returning to work before her next scheduled work day, which was inconsistent with the terms of its own policy.  DCA's policy on job abandonment required it to wait three days after the employee did not appear for his or her scheduled shift before declaring the employee to have abandoned the job.  Testimony of Patty Edwards (Doc. No. 109) at 3.  Ms. Deitz's next scheduled work day was not until Wednesday, January 16, 2008.  Patty Edwards testified that Dr. Donohue called her either over the weekend or on Monday morning before work started to tell her about the "big blowout" with Ms. Deitz

and that he thought she quit.  It also was her recollection that Ms. Deitz had quit because she did

not come to work that Monday.  Testimony of Patty Edwards (Doc. No. 71-14) at 70.  Despite

the confusion, no one from management attempted to contact Ms. Deitz on Monday to verify

whether she in fact quit or would be returning to work.  On Tuesday, DCA had already circulated

a memorandum indicating that Ms. Deitz was no longer with the practice.  CSMF (Doc. No. 100)

at 12.  It purportedly was sent out because she had not shown up for work.  Id.  All of this was

done before she was even scheduled to return to work on Wednesday.  CSMF (Doc. No. 100) at

12.  Under these circumstances a reasonable juror could conclude that there was no uncertainty

regarding the circumstances of separation and that Ms. Deitz was terminated on January 11,

2008.

 Additionally, genuine issues of material fact exist as to whether Ms. Deitz's complaints

about the doctors' behavior was a determinative factor in her termination.  It is of no

consequence that Ms. Deitz complained about both her failure to receive sufficient compensation

and the failure of DCA to take remedial action in response to her repeated complaints about the

environment in the same conversation.  See Moore, 461 F.3d  at 353 ("Opposition to

discrimination does not need to stand separate and apart from any other criticism of management

in order to be entitled to protection under the anti-relation provision.").  As recounted above, the

conversation immediately before Ms. Deitz was fired can be construed a number of ways and

will support the conclusion that if Dr. Donohue had fired her, it was because of her incessant

complaints regarding the sexually charged atmosphere and not because of her complaints about

her financial situation.  And the finder of fact may well determine that her financial complaints

were the result of retaliation for her complaints about the environment in the first instance.

In short, genuine issues of material fact exist with respect to the reasons underlying Ms.

Deitz's separation from employment.  The record as a whole will support a finding that she was

terminated in retaliation for her opposition to the doctors' sexually hostile and inappropriate

behavior.  It will also support a finding that defendant's explanation for Ms. Deitz's pay-cut and

departure are pretexts for retaliatory animus.[10]

*Constructive Discharge*

---

[10] The United States Court of Appeals for the Third Circuit has summarized the plaintiff's burden at summary judgment on the third step of the McDonnell Douglas tripartite analysis as follows:

> Specifically, in Fuentes v. Perskie, 32
> F.3d 759 (3d Cir. 1994), and later in Sheridan
> [E.I. DuPont de Nemours and Co., 100 F.3d
> 1061 (3d Cir. 1996) (en banc)], we stated that a
> plaintiff may defeat a motion for summary judgment
> (or judgment as a matter of law) by pointing "to some
> evidence, direct or circumstantial, from which a factfinder
> could reasonably either: (1) disbelieve the employer's
> articulated legitimate reasons; or (2) believe that
> an invidious discriminatory reason was more
> likely than not a motivating or determinative
> cause of the employer action."  Fuentes, 32 F.3d
> at 764; Sheridan, 100 F.3d at 1067.

Jones v. School District of Philadelphia, 198 F.3d 403, 412-13 (3d Cir. 1999).  Under the first approach, the finder of fact's rejection of the defendant's proffered explanation allows, but does not compel, a finding of discrimination and judgment for the plaintiff.  Sheridan, 100 F.3d at 1061; Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.").  In other words, once a defendant's justification has been discredited, a jury is entitled to infer that discrimination is the most likely alternative explanation, particularly because the defendant is in the best position to explain the actual reason for its decision.  Reeves, 530 U.S. at 147.  "Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  Id. at 148; Sheridan, 100 F.3d at 1061 (same); Fasold v. Justice, 409 F.3d 178, 187 (3d Cir. 2005) (emphasizing that "no affirmative or direct evidence of discrimination is required" in reiterating this well-established principle).

Plaintiff has proffered sufficient evidence to submit the issue of whether Mrs. Fendya constructively was discharged to the jury.  For purposes of a constructive discharge claim, a plaintiff must have evidence to support a finding "that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign."  Goss v. Exxon Office Systems, Co., 747 F.2d 885, 888 (3d Cir. 1984); accord Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993) (establishing a constructive discharge requires the plaintiff to proffer evidence that the conditions at the workplace were so intolerable that a reasonable person "in the employee's shoes" would resign) (citing Gray v. York Newspapers, Inc., 957 F.2d 1070, 1079 (3d Cir.1992)).  Under the doctrine of constructive discharge "an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes."  Hill v. Borough of Kutztown, 455 F.3d 225, 233 n.7 (3d Cir. 2006).  The United States Court of Appeals for the Third Circuit has adopted a reasonable person test, "which is focused on the impact of an employer's actions, whether deliberate or not, upon a 'reasonable' employee."  Levendos v. Stern Entertainment, Inc., 860 F.2d 1227, 1230 (3d Cir. 1988).  A plaintiff must present evidence from which the finder of fact can conclude that the "working conditions were so intolerable that a reasonable person would have felt compelled to resign."  Pennsylvania State Police v. Suders, 542 U.S. 129, 131 (2004).

Mrs. Fendya told Marcia Malesick that she "had it, had it with the environment, had it with the attitudes, had it with the way the doctors acted."  Testimony of Tammy Fendya (Doc. No. 118) at 23.  Her salary and benefits package played no role in her decision to resign from DCA.  Id. at 23.  From her perspective "the reason [she] looked for another job was . . . the

environment, the way the doctors were acting, their comments . . . ."  Id.

Moreover, the environment at DCA had caused her "great emotional distress" and the working conditions at DCA caused her to argue more with her husband.  Id. at 23-24.  She told him about the doctors' comments such as the blow job comments, which had upset him to the point where he offered to talk to the doctors for her.  Id. at 24.

The environment deteriorated during her employment at DCA.  When she first started at DCA she felt she was respected by the doctors and they would listen to her complaints.  But the last two years at DCA were especially troubling because she did not feel respected by the doctors.  Id. at 29.  It got to the point where the doctors would "blow [her] off.  Dr. Donohue would tell [her] not to stand on the cross, and [she] felt that [she] wasn't going to be able to change the environment."  Id. at 29.  She "[e]ven had nurses at the hospital or other nurse practitioners that actually felt sorry for [her] because [of] . . the way [she] was treated" by the doctors.  Id.

Mrs. Fendya fielded numerous complaints from nurses at the hospitals regarding the doctors' behavior, Dr. Saheta's in particular, and despite her reporting these complaints to Dr. Donohue, nothing changed.  She finally "realized this environment, this place was not going to change.  The[] [doctors] weren't going to change [their behavior]."  Id. at 29.  By the end, she "wanted out of there" and "wanted nothing more to do with them."  Deposition of Tammy Fendya (71-5) at 18.

Given the abundance of sexual commentary and innuendo, vulgar behavior, and the constant barrage of misogynistic and demeaning comments implying that males were superior and females were inferior emotionally and in their ability to tolerate happenings in the

56

workplace, a reasonable juror could well find that the working conditions were so intolerable that a reasonable person would have felt compelled to resign.  Consequently, defendant's motion for summary judgment on this basis must be denied as well.[11]

Date: September 30, 2011

s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:    M. Jean Clickner, Esquire
Deborah A. Kane, Esquire

Christian Bagin, Esquire

William Pietragallo, II, Esquire
Pamela G. Cochenour, Esquire
Kathryn M. Kenyon, Esquire

(Via: CM/ECF Electronic Filing)

---

[11] It is clear from the record that the outcome of this case largely will turn on the credibility of the witnesses and as such plaintiff-intervenor's motion for summary judgment also must be denied.  Defendants have come forward with enough evidence to preclude this case from being resolved on summary judgment, as the record read in the light most favorable to defendants will support a finding that the commentary was perceived as nothing more than "jocular, stress-relieving, meaningless" dialogue that did not rise to the level of creating a sexually hostile work environment.  The record is rife with questions of fact and rendering summary judgment in favor of any of the parties would be improper.